Frank S. Hedin (SBN 291289)
**HEDIN LLP**
1395 Brickell Ave., Suite 610
Miami, Florida 33131-3302
Telephone: (305) 357-2107
Facsimile: (305) 200-8801
E-Mail: fhedin@hedinllp.com

Adrian Gucovschi (State Bar No. 360988)
**GUCOVSCHI LAW FIRM**
165 Broadway, 23rd Floor
New York, New York 10006
Telephone: (212) 884-4230
E-Mail: adrian@gucovschilaw.com

*Counsel for Plaintiff and Putative Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMUEL HOKE, individually and on behalf of all others similarly situated, | Case No. _____ |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| AG1 (USA), INC., | (DEMAND FOR JURY TRIAL) |
| Defendant. | |

Plaintiff Samuel Hoke brings this action on behalf of himself and all others similarly situated against Defendant AG1 (USA), Inc.  Plaintiff makes the following allegations pursuant to the investigation of his counsel and upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## INTRODUCTION

1.     This is a putative class action lawsuit against Defendant for engaging in an illegal "automatic renewal" scheme.

2.     Defendant sells a wide range of health supplements through various online channels, including on its website, www.drinkag1.com (the "Website"), and in advertisements on social-media sites, including Instagram. Whenever a consumer purchases Defendant's products – whether it be on the Website or through a social-media advertisement – Defendant surreptitiously enrolls the consumer in an automatically renewing "subscription" that, unbeknownst to the consumer at the time, results in recurring charges to the consumer's credit card, debit card, or third-party payment account ("Payment Method") every month, in perpetuity until canceled (the "AG1 Subscriptions").[1]

3.     Prior to enrolling Plaintiff and the Class members into AG1 Subscriptions – and thereafter assessing each of their Payment Methods a recurring charge on a monthly basis – Defendant failed to provide the disclosures and authorizations required by California's Automatic Renewal Law ("ARL"), Cal. Bus. Prof. Code §§ 17600, *et seq.*, to any of these consumers.

4.     Pursuant to the ARL, online retailers that offer automatically renewing subscriptions to California consumers must: (i) provide the complete automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent prior to completion of the enrollment process, *see* Cal. Bus. Prof. Code § 17602(a)(1); (ii) obtain consumers' affirmative consent prior to charging their Payment Methods in connection with the subscriptions, *see id*. § 17602(a)(2); and (iii) provide an acknowledgment that includes the automatic renewal offer terms

---

[1] The AG1 Subscriptions are comprised of the following products: (1) AG Omega3 - 30 Servings; (2) AG1: Travel Packs - 30 Servings; (3) AG1: Pouch - 30 Servings; and (4) AGZ - 30 Servings.

and identifies a cost-effective, timely, and easy-to-use mechanism for consumers to cancel their subscriptions, *see id*. §§ 17602(a)(3), 17602(c).

5. As discussed in greater detail below, the electronic "checkout flows" on Defendant's Website and social-media advertisements, which Plaintiff and numerous other California consumers used to purchase Defendant's products, uniformly violated each of these core requirements of the ARL. And when consumers eventually do realize that Defendant has enrolled them in AG1 Subscriptions without their authorization – such as when consumers notice Defendant's recurring charges on their credit card billing statements – Defendant then makes it exceedingly difficult and unnecessarily confusing for consumers to cancel the AG1 Subscriptions.

6. Specifically, Defendant systematically violates the ARL by: (i) failing to present the automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent to the offer before the subscription or purchasing agreement is fulfilled, in violation of Section 17602(a)(1); (ii) charging consumers' Payment Methods without first obtaining their affirmative consent to the agreement containing the automatic renewal offer terms, in violation of Section 17602(a)(2); and (iii) failing to provide an acknowledgment that includes the automatic renewal offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in direct violation of Section 17602(a)(3). *See* Cal. Bus. & Prof. Code §§ 17602(a)(1)-(3); *see also id.* § 17601(b)(1)-(5) (setting forth the definition of "automatic renewal offer terms" as used in Cal. Bus. Prof. Code § 17602(a)).  The standardized post-order acknowledgment email Defendant sends to its customers also fails to disclose a toll-free telephone number or describe another cost-effective, timely, and easy-to-use mechanism for cancellation – making it exceedingly difficult and unnecessarily confusing for consumers to cancel AG1 Subscriptions – in clear violation of Section 17602(c) of the ARL.

7. As a result of Defendant's violations of Section 17602 of the ARL, the AG1 Subscriptions are deemed "unconditional gifts" pursuant to Section 17603 of the ARL, entitling Plaintiff and the Class to restitution.  *See* Cal. Bus. & Prof. Code § 17603.

8. For the foregoing reasons, Plaintiff brings this action individually and on behalf of all subscribers of any of Defendant's AG1 Subscriptions who, within the applicable statute of

limitations period up to and including the date of judgment in this action, were induced by Defendant's false sales or incurred unauthorized fees for the renewal of their AG1 Subscriptions. Based on Defendant's unlawful conduct, Plaintiff seeks damages, restitution, declaratory relief, injunctive relief, and reasonable attorneys' fees and costs, for: (1) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*; (2) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*; (3) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (4) negligent misrepresentation; (5) intentional misrepresentation; and (6) unjust enrichment/restitution.

## THE PARTIES

9.      Plaintiff Samuel Hoke is, and at all times relevant hereto was, a citizen and resident of Los Angeles, California.

10.      Defendant AG1 (USA), Inc is a Nevada corporation that maintains its corporate headquarters and principal place of business in Carson City, Nevada. Defendant is an online-based retailer of dietary supplements, which it sells on its Website to consumers nationwide, including throughout California.

11.      Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendant who has knowingly and willfully aided, abetted, and/or conspired in the false and deceptive conduct alleged herein.

## JURISDICTION AND VENUE

12.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this is a putative class action where the aggregate amount sought by members of the proposed class exceeds $5,000,000.00, exclusive of interests and costs, there are over 100 members of the putative class, and at least one class member is a citizen of a state different from Defendant.

13.      Personal jurisdiction and venue are proper because Plaintiff resides in Los Angeles, California, within this judicial District; because Plaintiff made his purchase of Defendant's products while he was physically present in Los Angeles, California; because Defendant shipped such goods

1    to Plaintiff's residence in Los Angeles, California; and because Plaintiff was located in Los Angeles,

2    California when Defendant enrolled him in, and thereafter charged his Payment Method on a

3    monthly basis pursuant to the AG1 Subscription.  Additionally, Defendant has, at all times relevant

4    hereto, systematically and continually conducted, and continues to conduct, business in California,

5    including within this judicial District, including through the promotion, marketing, and sale of its

6    products.

7                              **FACTUAL BACKGROUND**

8         **A.    Background On the Subscription-Based e-Commerce Industry**

9         14.    The e-commerce subscription model is a business model in which retailers provide

10    ongoing goods or services "in exchange for regular payments from the customer."[2]  Subscription e-

11    commerce services now target a wide range of customers and cater to a variety of specific interests.

12    Given the prevalence of online and e-commerce retailers, subscription e-commerce has grown

13    rapidly in popularity in recent years.  Indeed, the "subscription economy has grown more than 400%

14    over the last 8.5 years as consumers have demonstrated a growing preference for access to

15    subscription services[.]"[3]  Analysts at UBS predict that the subscription economy will expand into a

16    $1.5 trillion market by 2025, up from $650 billion in 2020.[4]  That constitutes an average annual

17

18    ───────────────

19    [2] Core DNA, *How to Run an eCommerce Subscription Service: The Ultimate Guide* (May 19, 2020), https://www.coredna.com/blogs/ecommerce-subscription-services.

20    [3] Business Insider, *Taco Bell's taco subscription is rolling out nationwide — here's how to get it*
21    (Jan.    6,    2022),    https://www.businessinsider.com/taco-bell-subscription-launching-across-the-country-2022-1 (internal quotation marks omitted).

22    [4]    *See*    UBS,    *Investing    in    digital    subscriptions*    (Mar.    10,    2021),
23    https://www.ubs.com/global/en/wealth-management/our-approach/marketnews/article.1525238.html ("[A]t close to USD 650 billion in 2020, we expect the
24    subscription economy to expand into a USD 1.5 trillion market by 2025, implying an average annual growth rate of 18%.").

25    *See also* Subscribed, *UBS Declares: It's Worth Investing in the Subscription Economy* (Apr. 17,
26    2021),    https://www.subscribed.com/read/news-and-editorial/ubs-declares-its-worth-investing-in-the-subscription-economy; Business 2 Community, *The Subscription Economy Is Booming Right*
27    *Now.    But    Are    You    Reaping    the    Full    Benefits?*    (Oct.    7,    2021), https://www.business2community.com/ecommerce/the-subscription-economy-is-booming-right-
28    now-but-are-you-reaping-the-full-benefits-02434851.

growth rate of 18%, which makes the subscription economy "one of the fastest-growing industries globally."[5]

15.     The production, sale, and distribution of subscription-based products and services is a booming industry that has exploded in popularity over the past few years.  According to *Forbes*, "[t]he subscription e-commerce market has grown by more than 100% percent a year over the past five years, with the largest retailers generating more than $2.6B in sales in 2016, up from $57.0M in 2011."[6] Following 2016, market growth within the industry increased exponentially, reaching $650 billion in 2020.[7]  "As such, the financials of companies with subscription business models[] … improved dramatically in 2020 thanks to limited revenue volatility and strong cash flow generation."[8]  Thus, "[t]he share prices of most subscription companies have performed well in recent years."[9]

16.     The expansion of the subscription e-commerce market shows no signs of slowing. "We're now in the subscriptions era, and the pandemic is accelerating its takeover.  During the COVID-19 lockdowns, many digital-based subscription business models fared well due to their promise of convenience and strong business continuity."[10]  According to *The Washington Post*, "[s]ubscriptions boomed during the coronavirus pandemic as Americans largely stuck in shutdown mode flocked to digital entertainment[.] … The subscription economy was on the rise before the

---

[5] UBS, *Investing in digital subscriptions* (Mar. 10, 2021), *supra* ("[Growth] was seen across many areas, including e-commerce, video streaming, gaming, cloud-based applications, etc."); *see also* Juniper Research, *Subscriptions For Physical Goods To Overtake Digital Subscriptions By 2025; Growing To Over $263bn Globally* (Oct. 12, 2020), https://www.juniperresearch.com/press/subscriptions-for-physical-goods-to-overtake (acknowledging "the significant lead the digital sector has had in th[e] area[ of digital service subscriptions]").

[6] Forbes, *The State Of The Subscription Economy, 2018* (Mar. 4, 2018), https://www.forbes.com/sites/louiscolumbus/2018/03/04/the-state-of-the-subscription-economy-2018/#6ad8251a53ef.

[7] *See* UBS, *Investing in digital subscriptions* (Mar. 10, 2021), *supra*.

[8] *Id.*

[9] *Id.*

[10] *Id.*

pandemic, but its wider and deeper reach in nearly every industry is expected to last, even after the pandemic subsides in the United States."[11]

17.    However, as *The Washington Post* has noted, there are downsides associated with the subscription-based business model.[12]  While the subscription e-commerce market has low barriers and is thus easy to enter, it is considerably more difficult for retailers to dominate the market due to the "highly competitive prices and broad similarities among the leading players."[13]  In particular, retailers struggle with the fact that "[c]hurn rates are high, [] and consumers quickly cancel services that don't deliver superior end-to-end experiences."[14]  Yet, retailers have also recognized that, where the recurring nature of the service, billing practices, or cancellation process is unclear or complicated, "consumers may lose interest but be too harried to take the extra step of canceling their membership[s]."[15]  As these companies have realized, "[t]he real money is in the inertia."[16]  As a result, "[m]any e-commerce sites work with third-party vendors to implement more manipulative designs."[17]  That is, to facilitate consumer inertia, a number of subscription e-commerce companies,

---

[11] The Washington Post, *Everything's becoming a subscription, and the pandemic is partly to blame* (June 1, 2021), https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/ (noting that "e-commerce and entertainment subscriptions to sites such as Netflix, Hulu and Disney Plus made headlines during the pandemic for soaring growth").

[12] The Washington Post, *Little-box retailing: Subscription services offer new possibilities to consumers, major outlets* (Apr. 7, 2014), https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html.

[13] McKinsey & Company, *Thinking inside the subscription box: New research on e-commerce consumers* (Feb. 2018), https://www.mckinsey.com/industries/technology-media-and-telecommunications/our-insights/thinking-inside-the-subscription-box-new-research-on-ecommerce-consumers#0.

[14] *Id.*

[15] The Washington Post, *Little-box retailing: Subscription services offer new possibilities to consumers, major outlets* (Apr. 7, 2014), https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html.

[16] *Id.*

[17] Business Insider, *A new study from Princeton reveals how shopping websites use 'dark patterns' to trick you into buying things you didn't actually want* (Jun. 25, 2019), https://www.businessinsider.com/dark-patterns-online-shopping-princeton-2019-6.

including Defendant, "are now taking advantage of subscriptions in order to trick users into signing up for expensive and recurring plans. They do this by intentionally confusing users with the design and flow of their website and apps, *e.g.*, by making promises of 'free trials' that convert after only a matter of days, and other misleading tactics," such as failure to fully disclose the terms of its automatic renewal programs.[18]

18.     To make matters worse, once enrolled in the subscription, "[o]ne of the biggest complaints consumers have about brand/retailers is that it's often difficult to discontinue a subscription marketing plan."[19] Moreover, "the rapid growth of subscriptions has created a host of challenges for the economy, far outpacing the government's ability to scrutinize aggressive marketing practices and ensure that consumers are being treated fairly, consumer advocates say."[20] For instance, numerous companies, including Defendant, have resorted to using "dark patterns" on their e-commerce platforms. A dark pattern is "a user interface carefully crafted to trick users into doing things they might not otherwise do, such as … signing up for recurring bills."[21] Thus, although "Federal Trade Commission regulators are looking at ways to make it harder for companies to trap consumers into monthly subscriptions that drain their bank accounts[ and] attempting to respond to a proliferation of abuses by some companies over the past few years[,]"[22] widespread utilization of misleading dark patterns and deliberate omissions persist.

---

[18] TechCrunch, *Sneaky subscriptions are plaguing the App Store* (Oct. 15, 2018), https://techcrunch.com/2018/10/15/sneaky-subscriptions-are-plaguing-the-app-store/.

[19] The Washington Post, *Everything's becoming a subscription, and the pandemic is partly to blame* (June 1, 2021), *supra* ("'Subscription services are a sneaky wallet drain,' said Angela Myers, 29, of Pittsburgh. 'You keep signing up for things and they make it really hard to cancel.'"); *see also* New Media and Marketing, *The problem with subscription marketing* (Mar. 17, 2019), https://www.newmediaandmarketing.com/the-problem-with-subscription-marketing/.

[20] *Id*.

[21] UX Design, *Dark patterns in UX: how designers should be responsible for their actions* (Apr. 15, 2018), https://uxdesign.cc/dark-patterns-in-ux-design-7009a83b233c (quoting UX designer Harry Brignull (PhD Cognitive Science), who coined the term "Dark Patters" in August 2010).

[22] The Washington Post, *Everything's becoming a subscription, and the pandemic is partly to blame* (June 1, 2021), *supra*.

19.     Defendant successfully capitalized on this demand. In fact, Defendant's growth in revenue and subscriber count with respect to its Subscriptions coincides with a sharp decline in subscriber satisfaction as the Subscriptions and the platforms from which they operate have become riddled with "dark patterns."   Specifically, Defendant has used various types of dark patterns, including but not limited to "Roach Motel,"[23] "Misdirection,"[24] and "Forced Continuity,"[25] in order to prevent users from canceling their Subscriptions by way of adopting complex cancellation procedures to increase the friction in the subscription cancellation process.  Defendant's utilization of these dark patterns – especially in conjunction with its failure to fully disclose the terms of its automatic-renewal programs (discussed further below) – has led to a reduction in churn rates by making it next to impossible for subscribers to cancel their Subscriptions. It has further led to an increase in accidental or unintentional sign-ups by consumers for paid Subscriptions, in effect increasing subscriber count and, thus, Defendant's overall revenues from renewal fees.[26]

20.     As discussed below, Defendant has employed a host of dark patterns in its Website and social-media advertisements to lure and deceive millions of consumers into becoming and

---

[23] "Roach Motel" refers to a "design [that] makes it very easy for [consumers] to get into a certain situation, but then makes it hard for [consumers] to get out of it (e.g. a subscription)." https://www.darkpatterns.org/types-of-dark-pattern/roach-motel.

[24] "Misdirection" is a type of dark pattern where a website's "design purposefully focuses [customers'] attention on one thing in order to distract [them] attention from another."  In many cases, "[w]hat's deceptive is the way [the website] presents [purchase] options: it uses misdirection to hide what is actually happening[.]"  https://www.darkpatterns.org/types-of-dark-pattern/misdirection.

[25] One example of "Forced Continuity," another type of dark pattern, is where customers' sign up for a "free trial with a service[ that] comes to an end and [their] credit card silently starts getting charged without any warning.  [The subscriber is] are then not given an easy way to cancel the automatic renewal."  https://www.darkpatterns.org/types-of-dark-pattern/forced-continuity.

[26] *See* Gizmodo, *Pervasive 'Dark Patterns' Are Fooling People Into Signing Up for Services They Don't Want* (Sep. 15, 2022), https://gizmodo.com/dark-patterns-ui-cancel-subscription-1849542166 ("As much as you think you have full control of you and your wallet, it's getting increasingly difficult for anybody using an app or a website to avoid getting suckered into surrendering your money or personal information to misleading or tricky UI design. … Tech companies and online retailers [] lure users into signing up for subscription services while obscuring costs or charges, then making it difficult to actually cancel.  Some dark patterns include confusing users in dense terms of service to obscure key limitations of products or junk fees attached to their use.")

remaining enrolled in AG1 Subscriptions. That is the precise conduct that California's legislature sought to prevent in enacting California's Automatic Renewal Law.

**B.      California's Automatic Renewal Law**

21.      In 2010, the California Legislature enacted the Automatic Renewal Law ("ARL"), Cal. Bus. & Prof. Code §§ 17600, *et seq*., with the intent to "end the practice of ongoing charging of consumer credit or debit cards or third party payment accounts without the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service." Cal. Bus. & Prof. Code § 17600 (statement of legislative intent).

22.      The ARL makes it "unlawful for any business making an automatic renewal or continuous service offer to a consumer in this state to do any of the following:"

> (1) Fail to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity[] … to the request for consent to the offer. If the offer also includes a free gift or trial, the offer shall include a clear and conspicuous explanation of the price that will be charged after the trial ends or the manner in which the subscription or purchasing agreement pricing will change upon conclusion of the trial.

> (2) Charge the consumer's credit or debit card, or the consumer's account with a third party, for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms, including the terms of an automatic renewal offer or continuous service offer that is made at a promotional or discounted price for a limited period of time.

> (3) Fail to provide an acknowledgment that includes the automatic renewal offer terms or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer. If the automatic renewal offer or continuous service offer includes a free gift or trial, the business shall also disclose in the acknowledgment how to cancel, and allow the consumer to cancel, the automatic renewal or continuous service before the consumer pays for the goods or services.

Cal. Bus. & Prof. Code § 17602(a)(1)-(3).

23.      The ARL also requires that, prior to the completion of the initial order for the automatic renewal or continuous service, sellers must explain the price to be charged when the

promotion or free trial ends.  *See* Cal. Bus. & Prof. Code § 17602(a)(1), *supra*.  If the initial offer is at a promotional price that is only for a limited time and will increase later, the seller must obtain consumer consent to the non-discounted price prior to billing.  *See id*.  Sellers must also notify consumers in the acknowledgment about how to cancel the free trial before they are charged.  *See* Cal. Bus. & Prof. Code § 17602(a)(3), *supra*.

24.    Section 17602(c) of the ARL further provides:

> A business that makes an automatic renewal offer or continuous service offer **shall provide a toll-free telephone number, electronic mail address,** a postal address if the seller directly bills the consumer, **or it shall provide another cost-effective, timely, and easy-to-use mechanism for cancellation** that shall be described in the acknowledgment specified in paragraph (3) of subdivision (a).

Cal. Bus. & Prof. Code § 17602(c). (emphasis added).

25.    Additionally, the ARL also requires e-commerce sellers, doing business in California, to allow online cancellation of auto-renewing memberships or recurring purchases that were initiated online.  Specifically, Section 17602(d) provides:

> [A] business that allows a consumer to accept an automatic renewal or continuous service offer online shall allow a consumer to terminate the automatic renewal or continuous service *exclusively online*, *at will*, *and without engaging any further steps that obstruct or delay the consumer's ability to terminate the automatic renewal or continuous service immediately*.

Cal. Bus. & Prof. Code § 17602(d)(1) (emphasis added).

26.    The ARL further specifies that a seller who provides an automatic offer "shall provide a method of termination that is online in the form of either of the following: (A) A prominently located direct link or button which may be located within either a customer account or profile, or within either device or user settings[; or] (B) By an immediately accessible termination email formatted and provided by the business that a consumer can send to the business without additional information." Cal. Bus. & Prof. Code § 17602(d)(1)(A)-(B).

27.    Section 17601(a) of the ARL defines the term "Automatic renewal" as a "plan or arrangement in which a paid subscription or purchasing agreement is automatically renewed at the end of a definite term for a subsequent term." Cal. Bus. & Prof. Code § 17601(a).

28.    Section 17601 of the ARL defines the term "Automatic renewal offer terms" as "the following clear and conspicuous disclosures: (1) That the subscription or purchasing agreement will continue until the consumer cancels.  (2) The description of the cancellation policy that applies to the offer.  (3) The recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement, and that the amount of the charge may change, if that is the case, and the amount to which the charge will change, if known.  (4) The length of the automatic renewal term or that the service is continuous, unless the length of the term is chosen by the consumer.  (5) The minimum purchase obligation, if any."  Cal. Bus. & Prof. Code § 17601, *et seq.*

29.    The ARL defines "clear and conspicuous" or "clearly and conspicuously" meaning "in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbol or other marks, in a manner that clearly calls attention to the language."  Cal. Bus. & Prof. Code § 17601.

30.    Finally, Section 17603 of the ARL provides that where a "business sends any goods, wares, merchandise, or products to a consumer, under a continuous service agreement or automatic renewal of a purchase, without first obtaining the consumer's affirmative consent[,]" the material sent will be deemed "an unconditional gift to the consumer, who may use or dispose of the same in any manner he or he sees fit without any obligation whatsoever on the consumer's part to the business[.]"  Cal. Bus. & Prof. Code § 17603.

31.    As alleged below, Defendant's practices on the Website and its social-media advertisements systematically violate Sections 17602(a)(l), 17602(a)(2), 17602(a)(3), 17602(c), and 17602(d) of the ARL.

## C.    Defendant's Business: The Subscription Enrollment Process

32.    At all relevant times, Defendant offered, via the Website and through social-media advertisements (including on Instagram), nutritional supplements to consumers.

33.    When a consumer purchases a product from Defendant on its website or through one of its social-media advertisements, Defendant surreptitiously enrolls the consumer in a AG1

Subscription that, unbeknownst to the consumer at the time, results in the consumer's Payment Method being assessed a recurring charge each and every month, in perpetuity (or until canceled by the consumer).

34.    Defendant's AG1 Subscriptions constitute automatic renewal and/or continuous service plans or arrangements for the purposes of Cal. Bus. & Prof. Code § 17601.

35.    Regardless of whether a consumer purchases a product from Defendant on its website or through one of its social-media advertisements, the process of making the purchase – and becoming unknowingly enrolled in a AG1 Subscription – is substantially the same. Upon navigating the final screen of the checkout process (the "Checkout Page"), consumers encounter a page which fails to comply with the ARL in numerous respects.

36.    Prior to enrolling Plaintiff and other Californians in AG1 Subscriptions, the ARL required Defendant to "present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity[] … to the request for consent to the offer." Cal. Bus. & Prof. Code § 17602(a)(1) (emphasis added). Under the ARL, a "clear and conspicuous" disclosure "means in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language." Cal. Bus. & Prof. Code §17601(3).

37.    On the Checkout Page, Defendant failed to present to Plaintiff or any member of the Class the terms of the AG1 Subscriptions in "larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language." *See id.* Instead, the only statement provided on the Checkout Page concerning AG1 Subscriptions appeared in miniscule, inconspicuous font (much smaller than the surrounding text on the Checkout Page), ***below*** the payment buttons that consumers must click to place an order. The screenshots

below show the Checkout Page as it appears when a visitor first arrives, as well as after they open the dropdown menu or scroll down to the credit card payment button:[27]




38.    The layout and text of the Checkout Page for each of the AG1 Subscriptions is aesthetically and functionally similar to the Checkout Page for the above-illustrated AG1 Subscription.  In all cases, the relevant portion of the Checkout Page fails to adequately disclose the automatic renewal terms associated with Defendant's AG1 Subscriptions in the manner required by law

39.    Specifically, Defendant failed to "first obtain[][any] consumer's affirmative consent to [any] agreement" with respect to the AG1 Subscription, let alone any such agreement "containing the automatic renewal offer terms or continuous service offer terms, including the terms of an automatic renewal offer or continuous service offer that is made at a promotional or discounted price for a limited period of time." Cal. Bus. & Prof. Code § 17602(a)(2). As illustrated by the Checkout

---

[27] The representative screenshots were taken on February 3, 2026.

Page above, although the relevant portion mentions that "[b]y continuing with your payment, you agree to the future charges listed on this page and the cancellation policy," *see supra* ¶ 37, the disclosure does not provide the exact amount of the recurring charges, the billing frequency, or a full description of the cancellation policy pertaining to the AG1 Subscription. Indeed, the only place where a consumer could find any of this information would be by expanding the "Order summary" drop-down. *Id.* Yet, even if they did so, the dropdown lists multiple products, and the AG1 Subscription simply includes a minuscule statement below stating "[e]very 30 days." *Id.* Further, the disclosure also omits the taxes and shipping fees associated with the subscription. Aside from being incomplete and inconspicuous, those statements are even more misleading because Defendant includes additional products with strike-through prices without indicating whether those products, or corresponding charges, are also part of the subscription. This language was, and did, mislead consumers about the true nature of the recurring charges. Similarly, the deadline for canceling recurring charges and other aspects of the cancellation policy are completely missing.

40.    Furthermore, at no point during the checkout process does Defendant require consumers to read or affirmatively agree to any terms of service associated with their AG1 Subscriptions, *i.e.*, by requiring consumers to select or click a "checkbox" next to the automatic renewal offer terms to complete the checkout process. Importantly, the disclosure in the relevant portion of the Checkout Page does not indicate what action a consumer must take to be bound to the AG1 Subscriptions' recurring charges. Specifically, the disclosure states that "[b]y continuing with your payment, you agree to the future charges listed on this page and the cancellation policy." *See supra* ¶ 37. However, the disclosure does not state that clicking the payment buttons constitutes agreement to those terms. Finally, because the disclosure is not visible unless consumers open the drop-down box (which they have no reason to do so), Plaintiff and the Class members could not have seen or agreed to the hidden terms. *Id*. Accordingly, when Defendant automatically renews customers' AG1 Subscriptions, Defendant charges consumers' Payment Methods without first obtaining their affirmative consent to the agreement containing the automatic renewal offer terms, in violation of Cal. Bus. & Prof. Code § 17602(a)(2).

41.    Finally, after enrolling a consumer in a AG1 Subscription, the ARL required Defendant to "provide an acknowledgment that includes the automatic renewal offer terms or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer." Cal. Bus. & Prof. Code § 17602(a)(3).

42.    After Plaintiff and members of the Class placed orders on the Checkout Page, Defendant sent them each the same pro forma e-mail regarding their purchase (the "Acknowledgment Email").

43.    The post-order Acknowledgment Emails that Defendant systematically sent to its customers (including to Plaintiff and all proposed Class members) uniformly failed to include "the automatic renewal offer terms or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer," as required by Cal. Bus. & Prof. Code § 17602(a)(3). Specifically, Defendant's Acknowledgment Emails failed to adequately disclose: that the AG1 Subscription "will continue until the consumer cancels[,]" Cal. Bus. & Prof. Code § 17601(b)(1); a statement of "[t]he recurring charges that will be charged to the consumer's [Payment Method] as part of the automatic renewal plan or arrangement, and that the amount of the charge may change, [and] if that is the case, and the amount to which the charge will change, Cal. Bus. & Prof. Code § 17601(b)(3); or "[t]he length of the automatic renewal term or that the service is continuous, unless the length of the term is chosen by the consumer[,]" Cal. Bus. & Prof. Code § 17601(b)(4).   As with the Checkout Page, disclosures of these required automatic renewal terms are either missing altogether, are deceptively incomplete, objectively inaccurate, and/or are inconspicuously buried in the tiny fine print at the bottom of the Acknowledgement Email. Further, the Acknowledgment Emails fail to provide a toll-free telephone number or describe another cost-effective, timely, and easy-to-use mechanism for cancellation of the AG1 Subscriptions, and, in fact, Defendant makes it exceedingly difficult and unnecessarily confusing for consumers to cancel AG1 Subscriptions. Accordingly, each of the Acknowledgment Emails that Defendant sent to Plaintiff and Class members violated sections 17602(a)(3), 17602(b), and 17602(c) of the ARL.

44.     During the time period relevant to this action, the form and content of the Acknowledgment Email sent by Defendant to each member of the putative Class were the same, in all material respects, as the Acknowledgment Email that Defendant sent to Plaintiff.

45.     In sum, during the relevant time period, Defendant's deficient pre- and post-purchase disclosures to Plaintiff and Class members concerning the AG1 Subscriptions were entirely non-compliant with the ARL.

46.     Because Defendant charged Plaintiff's and its other customers' Payment Methods in violation of the ARL, all goods, wares, merchandise, and/or products sent to Plaintiff and Class members upon the automatic renewal of their continuous service agreements are deemed to be "unconditional gifts" pursuant to Cal. Bus. & Prof. Code § 17603.

47.     As a direct result of Defendant's unlawful conduct described above, Plaintiff and putative Class members have incurred substantial financial injury in the form of all monies withdrawn from their Payment Methods in connection with the AG1 Subscriptions in which they were surreptitiously enrolled by Defendant.

**D.     Defendant misled Plaintiff regarding its automatic renewal subscriptions.**

48.     On March 5, 2025, Mr. Hoke made a purchase of two "AG1: Travel Packs" from Defendant's Website for $169.00 (excluding shipping and taxes). His enrollment process was virtually identical, in design and layout, to the pictures depicting the checkout process described above. *See supra* ¶ 37. When Mr. Hoke signed up, he thought he was simply placing a one-time purchase of Defendant's products plus three additional "gifts." Due to Defendant's misleading and incomplete ARL disclosures, Mr. Hoke was unaware of the length, price, or cancellation policy associated with the AG1 Subscription. *See supra* ¶¶ 39-41. Finally, Mr. Hoke did not, and could not, have given unambiguous assent to those terms because the disclosure stated "[b]y continuing with your payment, you agree to the future charges listed on this page and the cancellation policy," yet he clicked on the Apple Pay button – an act which is untethered from the terms of the disclosure. *See supra* ¶ 40. In short, Mr. Hoke did not expect, want, or consent to Defendant's automatic renewal billing.

49.    Consequently, following his purchase, Defendant assessed Mr. Hoke's Payment Method a recurring charge of $169.00 (excluding taxes) on April 4, 2025, and May 4, 2025. After learning that his purchase had become a recurring subscription, Mr. Hoke attempted to cancel the AG1 Subscription after the second renewal charge. However, due to Defendant's misleading cancellation process, he was enrolled in a bi-monthly AG1 Subscription instead and was charged an additional $169.00 (excluding taxes) on August 5, 2025. After that charge, Plaintiff was finally able to cancel the AG1 Subscription.

50.    Had Defendant complied with its ARL obligations, Mr. Hoke would have been aware of the full amount of the subscription charge and the date of cancellation before each billing period. As such, Mr. Hoke would not have enrolled in the subscription at all, or at a minimum, would have been aware of the exact date to cancel his subscription before being charged. Finally, had Defendant complied with the ARL, Mr. Hoke would have been able to cancel his subscription before the final renewal charge. As a direct result of Defendant's violations of the ARL as alleged herein, Mr. Hoke suffered economic injury. The facts giving rise to Mr. Hoke's claims are materially the same as those of the Class he seeks to represent.

## No Adequate Remedy at Law

51.    For his equitable relief claims, Plaintiff lacks an adequate remedy at law to address the unfair conduct at issue here. Legal remedies available to Plaintiff and Class are inadequate because they are not equally prompt, certain, and in other ways efficient as equitable relief. Damages are not equally certain as restitution because the standard that governs restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiff fails to sufficiently adduce evidence to support an award of damages. Damages and restitution are not the same amount. Unlike damages, restitution is not limited to the amount of money Defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles Plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize. Legal claims for damages are not equally certain as restitution because claims under the FAL and UCL entail fewer

elements. In short, significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law.

52.   Equitable relief is also appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from his purchase of the AG1 Subscription is determined to be an amount less than the total expenditure in connection with that subscription. Without compensation for the full price of the AG1 Subscription, Plaintiff would be left without the parity in purchasing power to which he is entitled. Finally, Plaintiff is entitled to equitable relief because the AG1 Subscriptions were, by operation of law, "unconditional gifts" to Plaintiff and putative Class members (*see* Cal. Bus. & Prof. Code § 17603) – and thus Plaintiff and Class members already owned the goods, tools, and benefits of the subscriptions as their personal property at the time Defendant withdrew monies from their Payment Methods as consideration for access to the same, without any legal or contractual authority to do so.

## <u>CLASS ACTION ALLEGATIONS</u>

53.   ***Class Definition***.  Plaintiff brings this action on behalf of a class of similarly situated individuals, defined as follows (collectively, the "Class"):

> All persons in the State of California who, within the applicable limitation period, up to and including the date of final judgment in this action, were charged a renewal fee for a AG1 Subscription by Defendant.

54.   Plaintiff reserves the right to amend the definition of the Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

55.   Specifically excluded from the Class are Defendant and any entities in which Defendant has a controlling interest, Defendant's agents and employees, the judge to whom this action is assigned, members of the judge's staff, and the judge's immediate family.

56.   Plaintiff reserves the right to amend the definition of the Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

57.   ***Numerosity.***   The Class is so numerous that their individual joinder herein is impracticable.  On information and belief, the Class comprise at least millions of consumers.  The precise number of the members of the Class and their identities are unknown to Plaintiff at this time

but may be determined through discovery. The members of the Class may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

58. ***Commonality and Predominance.*** Common questions of law and fact exist as to all the members of the Class and predominate over questions affecting only individual members. Common legal and factual questions include, but are not limited to: (a) whether Defendant's AG1 Subscriptions constitute "Automatic renewal[s]" within the meaning of Cal. Bus. & Prof. Code § 17601(a); (b) whether Defendant failed to present the automatic renewal offer terms, or continuous service offer terms, in a clear and conspicuous manner before the subscription or purchasing agreement was fulfilled and in visual proximity to the request for consent to the offer, in violation of Cal. Bus. & Prof. Code § 17602(a)(l); (c) whether Defendant charged Plaintiff's and the Class members' Payment Method for an automatic renewal or continuous service without first obtaining their affirmative consent to the automatic renewal offer terms or continuous service offer terms in violation of Cal. Bus. & Prof. Code § 17602(a)(2); (d) whether Defendant failed to provide an acknowledgment that included the automatic renewal or continuous service offer terms, cancellation policy, and information on how to cancel in a manner that is capable of being retained by Plaintiff and the Class members, in violation of Cal. Bus. & Prof. Code § 17602(a)(3); (e) whether the goods and services provided by Defendant are deemed an "unconditional gift" in accordance with Cal. Bus. & Prof. Code § 17603; (f) whether Defendant's conduct alleged herein violated California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, et seq., California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, et seq., and/or California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq.; (g) whether Defendant's conduct alleged herein constitutes conversion and/or unjust enrichment; (h) whether Plaintiff and the Class are entitled to damages and/or restitution; (i) whether Defendant should be enjoined from further engaging in the misconduct alleged herein; and (j) whether Plaintiff and the Class are entitled to attorneys' fees and costs under California Code of Civil Procedure § 1021.5.

59. ***Typicality.*** The claims of Plaintiff are typical of the claims of the Class in that Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's failure to obtain Plaintiff's and the Class members affirmative consent to

the automatic renewal offer terms or continuous service offer terms associated with the AG1 Subscriptions before charging their Payment Methods.

60.    **Adequacy**.  Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff has no interests antagonistic to the Class' interests, and Plaintiff has retained counsel that has considerable experience and success in prosecuting complex class actions and consumer-protection cases.

61.    **Superiority**.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions of individual actions are economically impractical for members of the Class; the Class are readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

62.    Defendant has acted or failed to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

63.    Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiff and the Class and will likely retain the benefits of its wrongdoing.

64.    Based on the foregoing allegations, Plaintiff's claims for relief include those set forth below.

<u>**COUNT I**</u>
**Violations of California's False Advertising Law ("FAL"),**
**Cal. Bus. & Prof. Code §§ 17500, *et seq*.**
**(On behalf of Plaintiff and the Class)**

65.    Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

66.    Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant.

67.    California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state,  …in any advertising device … or in any other manner or means whatever,

including over the Internet, any statement, concerning … personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

68.    Defendant has violated, and continues to violate, section 17500 of the Business and Professions Code by disseminating untrue and misleading advertisements to Plaintiff and the members of the Class.

69.    As alleged more fully above, Defendant violated, and continues to violate, section 17500 of the FAL through its misrepresentations and omissions made to consumers before and after enrollment into its AG1 Subscriptions regarding the terms of payment for and cancellation of a consumer's automatic payments.  Specifically, Defendant is silent regarding the material terms of its AG1 Subscriptions policies, including the recurring fees (including taxes), the products that form part of the subscription, and how and when to cancel the subscriptions. These misrepresentations and omissions on the Checkout Page and the Acknowledgment Email constitute false and deceptive advertisements.

70.    Defendant's actions in violation of the FAL, as described herein, were false and misleading, such that the general public is and was likely to be deceived.

71.    Plaintiff and the members of the Class did not learn of Defendant's automatic payment policies until after they had already signed up and started paying for Defendant's AG1 Subscriptions.

72.    As such, Plaintiff and the members of the Class saw, read, and reasonably relied on Defendant's statements and omissions to their detriment.

73.    In addition, class-wide reliance can be inferred because Defendant's representations were material, *i.e.*, a reasonable consumer would consider them important in deciding whether to enroll in the AG1 Subscriptions and deciding when to cancel them.

74.    Defendant's representations were a substantial factor and proximate cause in causing damages and losses to Plaintiff and the members of the Class.

75.    Plaintiff and the members of the Class suffered economic injury as a direct result of Defendant's conduct because they were induced to purchase AG1 Subscriptions and/or pay renewal

fees they would not have otherwise paid. Had Defendant fully and clearly disclosed the terms associated with the AG1 Subscriptions, Plaintiff and the members of the Class would not have subscribed to the AG1 Subscriptions, or they would have canceled their AG1 Subscriptions earlier, i.e., prior to the expiration of the initial subscription period.

76.     Plaintiff and the members of the Class seek restitution, attorneys' fees, and all other relief that the Court deems proper.

### COUNT II
### Violations of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.* (On behalf of Plaintiff and the Class)

77.     Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

78.     Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant.

79.     Plaintiff and the members of the Class are "consumers" within the meaning of Cal. Civil Code § 1761(d) in that Plaintiff and the Class sought or acquired Defendant's goods and/or services for personal, family, or household purposes.

80.     Defendant's selection and/or subscription offers and the other products pertaining thereto are "goods" and/or "services" within the meaning of Cal. Civil Code § 1761(a) and (b). The purchases by Plaintiff and the Class are "transactions" within the meaning of Cal. Civil Code § 1761(e).

81.     The acts and practices of Defendant as described above were intended to deceive Plaintiff and the Class as described herein, and have resulted, and will result, in damages to Plaintiff and the Class. These actions violated, and continue to violate, the CLRA in at least the following respects: (a) Defendant's representations and omissions about the nature of the AG1 Subscriptions billing, cancellation, automatic payment terms, policies, and requirements conveyed that they have characteristics, uses, and/or benefits, which they do not, in violation of Cal. Civil Code §1770(a)(5); and (b) Defendant's acts and practices constitute the advertisement of the goods in question without the intent to sell them as advertised, in violation of Cal. Civil Code § 1770(a)(9).

82.     Plaintiff and the members of the Class suffered economic injury as a direct result of Defendant's conduct because they were induced to purchase AG1 Subscriptions and/or pay renewal fees they would not have otherwise paid. Had Defendant fully and clearly disclosed the terms associated with the AG1 Subscriptions, Plaintiff and the members of the Class would not have subscribed to the AG1 Subscriptions, or they would have canceled their AG1 Subscriptions earlier, *i.e.*, prior to the expiration of the initial subscription period.

83.     Plaintiff, on behalf of themselves and all other members of the Class, seeks an injunction prohibiting Defendant from continuing its unlawful practices in violation of the CLRA.

84.     In compliance with the provisions of California Civil Code § 1782, Plaintiff sent written notice to Defendant on February 3, 2026, informing Defendant of his intention to seek damages under California Civil Code § 1750.  The letter was sent via certified mail, return receipt requested, advising Defendant that it was in violation of the CLRA and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom. The letter expressly stated that it was sent on behalf of Plaintiff and "all other persons similarly situated."  Accordingly, if Defendant fails to take corrective action within 30 days of receipt of the demand letter, Plaintiff will amend their complaint to include a request for damages as permitted by Civil Code § 1782(d) for Defendant's violations of the CLRA.

**COUNT III**
**Violations of California's Unfair Competition Law ("UCL"),**
**Cal. Bus. & Prof. Code §§ 17200, *et seq*.**
**(On behalf of Plaintiff and the Class)**

85.     Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

86.     Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant.

87.     The UCL prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act[.]"  Cal. Bus. & Prof. Code § 17200.  The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL.  Cal. Bus. &

Prof. Code § 17204.  Such a person may bring such an action on behalf of himself or herself and others similarly situated who are affected by the unlawful and/or unfair business practice or act.

88.    As alleged in detail above, and incorporated herein by reference, Defendant's deceptive enrollment process and false sales of the AG1 Subscriptions violate the UCL's proscription against engaging in **Unlawful Business Practices** through its violations of the FAL, Cal. Bus. & Prof. Code § 17500, *et seq.*; CLRA, Cal. Civ. Code § 1770, *et seq.*; the ARL, Cal. Bus. & Prof. Code § 17602, *et seq.*; and ROSCA, 15 U.S.C. § 8403 ,*et seq.*

89.    As alleged in detail above, Defendant violated the ARL and ROSCA by failing to: (a) provide the auto-renewal terms associated with its AG1 Subscriptions "in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity[] … to the request for consent to the offer," in violation of Cal. Bus. & Prof. Code § 17602(a)(1); (b) obtain the affirmative consent of Plaintiff and the Class to those terms before charging their Payment Methods, in violation of Cal. Bus. & Prof. Code § 17602(a)(2); and (c) provide an acknowledgment that includes the automatic renewal or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in violation of Cal. Bus. & Prof. Code §§ 17602(a)(3).  Defendant also makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their AG1 Subscriptions, in violation of Cal. Bus. & Prof. Code § 17602(b).

90.    Each of these acts and practices constitutes an independent violation of the ARL, ROSCA, the FAL, and CLRA, and thus an independent violation of the UCL.

91.    Defendant has also violated the UCL's proscription against engaging **in Unfair Business Practices.**  Defendant's acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200, *et seq.* in that Defendant's conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

92.    There is no public utility to Defendant's illegal automatic renewal practices. The gravity of the consequences of Defendant's conduct as described above outweigh any justification,

motive, or reason thereof, particularly considering the available legal alternatives for subscriptions in the marketplace. Defendant's illegal auto-renewal and false sales practices only injure healthy competition and harm consumers.

93.    Plaintiff and the Class could not have reasonably avoided this injury. Defendant's representations and omissions were deceptive to reasonable consumers like Plaintiff and the Class members.

94.    Defendant also violated established public policy by violating the ARL, FAL, CLRA, and ROSCA. The unfairness of these practices is tethered to the legislatively declared policy from each of those statutes.

95.    Defendant has also violated the UCL's proscription against engaging **in Deceptive Business Practices.**  As alleged in detail above, Defendant committed deceptive acts by enrolling consumers in automatically recurring subscriptions in violation of the FAL, CLRA, ARL and ROSCA.

96.    Specifically, Defendant committed deceptive acts by including misleading language and omitting material facts about the auto-renewal features of the AG1 Subscriptions. These representations were false and misleading.

97.    Defendant's representations were misleading to Plaintiff and other reasonable consumers.

* * *

98.    For all prongs, Defendant's representations were intended to induce reliance, and Plaintiff saw, read, and reasonably relied on them when enrolling in their AG1 Subscriptions. Defendant's representations were a substantial factor in Plaintiff's purchasing decisions.

99.    In addition, class-wide reliance can be inferred because Defendant's representations were material, *i.e.*, a reasonable consumer would consider them important in deciding whether to enroll in the AG1 Subscriptions and deciding when to cancel them.

100.    Defendant's violations have continuing and adverse effects because Defendant's unlawful conduct is continuing, with no indication that Defendant intends to cease this unlawful

course of conduct.  The public and the Class are subject to ongoing harm because the unlawful and/or unfair business practices associated with the AG1 Subscriptions are still used by Defendant today.

101.    Defendant's representations were a substantial factor and proximate cause in causing damages and losses to Plaintiff and the members of the Class.

102.    Plaintiff and the members of the Class suffered economic injury as a direct result of Defendant's conduct because they were induced to purchase AG1 Subscriptions and/or pay renewal fees they would not have otherwise paid.  Had Defendant fully and clearly disclosed the terms associated with the AG1 Subscriptions, Plaintiff and the members of the Class would not have subscribed to the AG1 Subscriptions, or they would have canceled their AG1 Subscriptions earlier, *i.e.*, prior to the expiration of the initial subscription period.

103.    Furthermore, Plaintiff and the members of the Class suffered economic injury as a direct result of Defendant's conduct because all products received from Defendant in violation of the ARL constitute "unconditional gifts."  *See* Cal. Bus. Prof. Code § 17603. As such, Defendant has received, and continues to hold, unlawfully obtained property and money belonging to Plaintiff and the Class members in the form of payments made by Plaintiff and the Class members for their AG1 Subscriptions.

104.    Pursuant to California Business and Professional Code § 17203, Plaintiff and the Class members seek restitution, attorneys' fees, and all other relief that the Court deems proper.

**COUNT IV**
**Negligent Misrepresentation**
**(On behalf of Plaintiff and the Class)**

105.    Plaintiff re-alleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

106.    Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant under the laws of California.

107.    As discussed above, Defendant made false representations and material omissions of fact to Plaintiff and the Class concerning the AG1 Subscriptions' billing, cancellation, automatic payment terms, policies, and requirements.

108.   These representations were false.

109.   When Defendant made these misrepresentations and material omissions of fact, it knew or should have known that they were false or misleading. Defendant had no reasonable grounds for believing that these representations were true or that the material omissions were not misleading when made.

110.   Defendant intended that Plaintiff and Class members rely on these representations and material omissions of fact and Plaintiff reasonably relied on them.

111.   In addition, class-wide reliance can be inferred because Defendant's misrepresentations and omissions were material, i.e., a reasonable consumer would consider them important in deciding whether to enroll in Defendant's AG1 Subscriptions.

112.   Defendant's misrepresentations and omissions were a substantial factor and proximate cause in causing damages and losses to Plaintiff and the Class members.

113.   Plaintiff and the members of the Class suffered economic injury as a direct and proximate result of Defendant's conduct because they were induced to purchase AG1 Subscriptions and/or pay renewal fees they would not have otherwise paid. Had Defendant fully and clearly disclosed the terms associated with the AG1 Subscriptions, Plaintiff and the members of the Class would not have subscribed to the AG1 Subscriptions, or they would have canceled their AG1 Subscriptions earlier, *i.e.*, prior to the expiration of the initial subscription period.

114.   For the negligent misrepresentation claims, Plaintiff seeks all damages available, including expectation damages, punitive damages, and/or damages measured by the price premium charged to Plaintiff and the Class as a result of Defendant's unlawful conduct.

## COUNT V
### Intentional Misrepresentation
### (On behalf of Plaintiff and the Class)

115.   Plaintiff re-alleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

116.   Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant under the laws of California.

117.    As discussed above, Defendant made false representations and material omissions of fact to Plaintiff and the Class concerning the AG1 Subscriptions' billing, cancellation, automatic payment terms, policies, and requirements.

118.    These representations and material omissions of fact were false and misleading.

119.    When Defendant made these misrepresentations and material omissions of fact, it knew that they were false and misleading at the time they were made and/or Defendant acted recklessly in making the misrepresentations and omissions.

120.    Defendant intended that Plaintiff and the members of the Class members rely on these representations and material omissions of fact and Plaintiff reasonably relied on them.

121.    In addition, class-wide reliance can be inferred because Defendant's misrepresentations and omissions were material, i.e., a reasonable consumer would consider them important in deciding whether to enroll in Defendant's AG1 Subscriptions.

122.    Defendant's misrepresentations and omissions were a substantial factor and proximate cause in causing damages and losses to Plaintiff and the members of the Class.

123.    Plaintiff and the members of the Class suffered economic injury as a direct and proximate result of Defendant's conduct because they were induced to purchase AG1 Subscriptions and/or pay renewal fees they would not have otherwise paid.  Had Defendant fully and clearly disclosed the terms associated with the AG1 Subscriptions, Plaintiff and the members of the Class would not have subscribed to the AG1 Subscriptions, or they would have canceled their AG1 Subscriptions earlier, i.e., prior to the expiration of the initial subscription period.

124.    For the intentional misrepresentation claims, Plaintiff seeks all damages available, including expectation damages, punitive damages, and/or damages measured by the price premium charged to Plaintiff and the Class as a result of Defendant's unlawful conduct.

**COUNT VI**
**Unjust Enrichment / Restitution**
**(On behalf of Plaintiff and the Class)**

125.    Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

126.    Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant under the laws of California, in the alternative.

127.    Plaintiff and the Class conferred benefits on Defendant by purchasing the AG1 Subscriptions.

128.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff and the Class purchases of the AG1 Subscriptions.   Retention of those monies under these circumstances is unjust and inequitable because Defendant's misrepresentations and material omissions of fact regarding the AG1 Subscriptions, in violation of California and federal laws, induced Plaintiff and the members of the Class to purchase the AG1 Subscriptions under false pretenses.  These material misrepresentations and omissions of fact caused injuries to Plaintiff and the members of the Class because they would not have purchased the AG1 Subscriptions at all, or on the same terms, if the true facts were known.

129.    Due to Defendant's misrepresentations and violation of California and federal laws, its contracts with Plaintiff and the members of the Class are void or voidable.

130.    Furthermore, since Plaintiff never clicked on any button that would bind him to any of Defendant's disclosures, clicking on the Apple Pay button instead, he never gave unambiguous consent to any of Defendant's auto-renewal terms. As such, his contract, and those of the other ARL Class members who clicked other payment buttons, are also void as a matter of law.

131.    Plaintiff and the members of the Class seek restitution, and in the alternative, rescission.

132.     For the quasi-contract/unjust enrichment claims, Plaintiff seeks all available equitable relief, including injunctive relief, disgorgement, and restitution in the form of a full refund

and/or measured by the price premium charged to Plaintiff and the members of the Class as a result of Defendant's unlawful conduct.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a. For an order certifying the Class and naming Plaintiff as a representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

b. For an order declaring Defendant's conduct violates the statutes referenced herein;

c. For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

d. For actual, expectation, reliance, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

e. For prejudgment interest on all amounts awarded;

f. For rescission, restitution and all other forms of equitable relief;

g. For injunctive relief as pleaded or as the Court may deem proper; and

h. For an order awarding Plaintiff and the Class their reasonable attorneys' fees, expenses, and costs of suit.

### DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: February 3, 2026.                          Respectfully submitted,


                                    By:    _/s/ Adrian Gucovschi_

                                           Adrian Gucovschi (SBN 360988)
                                           **GUCOVSCHI LAW FIRM, PLLC.**
                                           Adrian Gucovschi (SBN 360988)
                                           165 Broadway, Fl. 23
                                           New York, NY 10006
                                           Telephone: (212) 884-4230
                                           Facsimile: (212) 884-4230
                                           E-Mail: adrian@gucovschilaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-and-

**HEDIN LLP**
Frank S. Hedin (SBN 291289)
1395 Brickell Ave., Suite 610
Miami, Florida 33131-3302
Telephone: (305) 357-2107
Facsimile: (305) 200-8801
E-Mail: fhedin@hedinllp.com

*Attorneys for Plaintiff*

**<u>CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)</u>**

I, Adrian Gucovschi, declare as follows:

1.       I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.

I am a partner at Gucovschi Law Firm, PLLC, counsel of record for Plaintiff Samuel Hoke in this action.  Plaintiff alleges that he is a citizen of California who resides in Los Angeles, California.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.       The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that Defendant AG1 (USA), Inc regularly does business in the Central District of California, and a substantial portion of the events alleged in the Complaint, including the same misrepresentations, omissions, and injuries as alleged herein, have occurred in this judicial District.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct, and that this declaration was executed at Miami, Florida, on February 3, 2026.

*/s/ Adrian Gucovschi*
Adrian Gucovschi